FRANCIS J. SCHROEDER

          VS.                                    No. 8065.

THE AMALGAMATED ASS'N. OF STREET

AND ELECTRIC RY. EMPLOYEES & al.,
                    Appellants.

November 28th, 1921.

Court of Appeal
PARISH OF ORLEANS
FILED NOV 28/21

FRANCIS J. SCHROEDER

    VS.                                                        No. 8065.

AMALGAMATED ASS'N. OF STREET
AND ELECTRIC RY EMPLOYEES & al.,
                Appellants.

CHARLES F. CLAIBORNE, JUDGE.

        The plaintiff claims a death benefit from the defendant Association and from Local Division Number 194 thereof.

        He avers that Clarence J. Schroeder became a member of Local Division Number 194 of the Amalgamated Association of Street & Electric Railway Employees of America more than three years prior to January 20th, 1918, and continued as such up to the time of his death; that by virtue of said membership he became a member of said Amalgamated Association of Street and Electric Railway Employees; that during August 1917 said Clarence J. Schroeder v olunteered in the naval service of the United States; that in October 1917 he paid his dues for September and October 1917 to said Association and tendered his monthly dues for November 1917 to the Local Financial Secretary of said Associations

           "who refused to accept the same stating that Clarence J.
           Schroeder would be maintained a member in good standing
           of both said corporations, without payment of dues, and
           without charge until discharged from the naval service
           of the United States";

that the said Clarence J. Schroeder died at Yorktown, Virginia, on January 20th, 1918; that the Amalgamated Association of Street and Electric Railway Employees pays a fundral benefit of $800.00 and the Local Division 194 $200.00 upon the death of one of its members, to the legatee of the deceased who has been a member for

more than three years; that the said Clarence J. Schroeder left a testament by which he donated his death benefits to petitioner Francis J. Schroeder which said Associations refuse to pay notwithstanding demand.

The defendant, the Amalgamated Association, denied that Clarence J. Schroeder at the time of his death was a member in good standing as required by Section 92 of the By-Laws of said Association; that said Section reads as follows:

"No death or disability claim shall be allowed or paid to a member or any beneficiaries of members whose death or disability has been caused while on duty as a soldier, volunteer militiaman, policeman or City fireman, or to any member being injured or killed while engaged in any other line of employment, except that of street and electric railway work in some department where the member is eligible to membership under this Constitution and the laws of this Association".

Defendant further alleged that under said section excluding a member "while on duty as a soldier", plaintiff's petition disclosed no cause of action.

The trial Judge was of opinion that the defense failed because the deceased member was neither

"a soldier, a volunteer militiaman, a policeman, or a fireman, and second that he was killed at all, but died of disease",

and he rendered judgment in favor of the plaintiff.

The defendants appealed.

Mary Yoakum, an aunt of Clarence Schroeder testified, that she paid his dues in October 1917, and after they had received her money they told her that if anything happened to him in the service, it was up to Uncle Sam to look out, that they could not do anything for her; that they would refuse to take the money hereafter, and when he returned his position would be

27

there; that they explained to her, that if death occurred while he was in the United States Naval service, that she would not receive any benefit from the Association, but that Uncle Sam would have to look out for her from the insurance for the United States Marines.

It was admitted that Clarence J. Schroeder was initiated a member of the defendant Association on December 1st, 1915; that he volunteered in the Naval Service of the United States on May 23d, 1917; that he fell sick on the U. S. Ship Minnesota, in Yorktown, Virginia in January 1918, and that he died there of appendicitis on January 20th, 1918.

Gus B. Bienvenu, Secretary of Division No. 194 testified that when Mrs. Yoakum came to pay the dues he

> "explained to the lady that he would have to be square on the books of the Association, and that he would not have to pay any more dues until he returned from the military service; that he was carried the same as a withdrawn member, and, in that event, if anything was to happen to him while he was under the jurisdiction of Uncle Sam, it would be up to Uncle Sam, but when he returned, that he had his same seniority rights and his age in the organization, it was passed at our last convention";

the witness was shown a notice from the National President, dated October 10th, 1917, relative to a Resolution which was adopted at the Providence Convention in 1917; he was asked whether he received it; he answered yes, and said that he was positively acting under it; he explained this notice to Mrs. Yoakum and

> "the other portions of our laws which have been there ever since we have been instituted in regard to men that were in the military service, hold no right, and are not entitled to benefits in the organization".

28

Section 92 of the By-Laws is not free from obscurity.
We interpret it however to mean that no death claim shall be
paid to the beneficiaty of any member whose death has been caused,
by any agency or under any circumstances, while performing the
duties of a soldier, and other dangerous occupations mentioned,
nor shall any member be entitled to a benefit who shall have been
injured or killed while engaged in any other line of employment
than that of street and electrical railway work. In simpler
words, a member forfeits benefits absolutely while on duty as a
soldier, while he forfeits during employment otherwise than in
railway work only if he be injured or killed in that other em-
ployment. According to that interpretation Clarence J. Schroeder
forfeits his rights to all benefits if the word "soldier" covers
engagement in the "navy". We think it does, within the meaning,
intent, and purpose of Sec. 92 quoted above and of the Resolution
to which we shall allude below.

The Civil Code lays down rules for the interpreta-
tion of laws and contracts.

Art. 18 (18)

"The universal and most effectual way of discussing
the true meaning of a law, when its expressions are
dubious, is by considering the reason and spirit of
it, or the cause which induced the Legislature to
enact it".

Art. 1950 (1945)

"When there is anything doubtful in agreements, we
must endeavor to ascertain what was the common in-
tention of the parties, rather than adhere to the
literal sense of the terms".

Art. 1956 (1951)

"When the intent of the parties is doubtful, the
construction put upon it, by the manner in which it

29

has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation".

Guided by these lights we must inquire what was the spirit and reason of Section 92. It was evidently because the occupation of soldier, milltiaman, policeman, or fireman, was too hazardous to justify the Association to keep upon its rolls, as members in good standing, persons thus engaged. It was to exclude members engaged in war. It was evident that the Association could not assume such risks, which, in time of war, might have wrecked its finances in a short time. Nor is it a strained construction to say that a man engaged in the navy is a "soldier". The Century Dictionary, among other/ definitions of the word "soldier" says:

"A person in military service. One whose business is warfare, as opposed to a civilian".

137 U. S. 147.

The case of Abrams vs Bartlett, 18 Iowa 513 seems to be against that construction.

In that case the question was whether one who was acting master in the navy of the United States was protected by a statute which exempted from seizure

"any property of any soldier in the actual military service of the United States."

The Court said that one in "the naval service" was not in "the military service". The words "military service", in their opinion, thus accentuated, excluded "naval service". On the other hand it has been held that

"the military resources of a country include both army and navy, and the phrase "military office" has been legally construed to apply to both".

Century Dictionary Vo. Military - 5 C. J. 294.

The "Michigan Soldiers' Home" was created to receive all discharged soldiers, sailors, and marines. 148 N. W. 220.

The intention of the By-Laws and the construction put upon them by the parties in interest are equally in support of the interpretation that by the word "soldier" embraced all those who might engage in war, *whether in the army or in the navy.*

At the 15th. Convention of the Amalgamated Association of Street and Electric Railway Employees of America, held at Providence, R. I. on September 10th, to 18th, 1917, the following Resolution was adopted:

"That the International Association shall assume the back per capita and place the members in good standing in respect to death, disability and old age benefits upon their return from war-service; liability of the Association for said benefits to be governed by that section of the Constitution that provides that during said service, said members shall be non-beneficial. Neither shall benefits derive from injury sustained or impairment of health from or during said war service. Further, said member, upon return from said war or military service, and before assumption of liability for benefits by the Association, shall be subject to physical examination to establish the fact of existance of a condition of health to meet the requirements of new members entering the Association as provided by the Section of the Constitution providing therefor. Such member shall then be placed in good standing with continuity of good standing from first entrance into membership, and shall be returned to his full seniority in replacement in employment, the same as though of no elapse of time in military service".

It will be observed that during the discussion that preceded the adoption of this Resolution no one disputed the truth

of the declaration therein contained that

> "liability of the Association for said benefits to be governed by that section of the Constitution <u>that provides that during said service (war-service) said members shall be non-beneficial"</u>.

Nor has there been any suggestion made that the Convention lacked the authority to adopt the Resolution or that it was not the law of the Association from the date of its adoption.

Clarence J. Schroeder, through his representative, was informed in October 1917 of the adoption of this Resolution, the dues that he offered to pay as a member in good standing were refused, and he was told that if anything happened to him while in service, he would receive no benefit.

The judgment herein is therefore reversed, and it is now ordered that there be judgment in favor of the defendants, and that the plaintiff's demand be rejected at his cost in both Courts.

November 28th, 1921.

NO. 8065

COURT OF APPEAL

PARISH OF ORLEANS

FRANCIS J. SCHROEDER,

versus

AMALGAMATED ASSOCIATION OF STREET &
ELECTRIC RAILWAY EMPLOYEES OF AMERICA

APPEAL FROM THE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS,
DIVISION "A," H.C. CAGE, JUDGE.

ON SECOND APPLICATION FOR RE-HEARING

DISSENTING OPINION OF JUDGE WM.A.BELL

to the

JUDGMENT OF THIS COURT DENYING SECOND APPLICATION FOR RE-HEARING.

27/22

33

BY: WILLIAM A. BELL, JUDGE:

        I respectfully dissent from the judgment of the
Court herein rendered this day, whereby a second application for
re-hearing has been denied for the reasons that I am of the
opinion that the judgment of this court rendered on the 27th
day of February, 1922, reinstating the judgment of the Court
rendered on the *28* day of *November* 192*1* , was null and void.
My conclusions to this effect are based upon the fact that the
legal result of the former granting of a re-hearing in this
case was to suspend or wholly set aside the original judgment
of this Court, which reversed the judgment of the Court a qua,
until the rendition of a concurrent judgment on re-hearing by
at least two judges of this Court, each of whom will have heard
and tried this cause de novo on re-hearing. The Court in this
case is bound of its own motion, to take cognizance of the
following facts:

        1st. That on the *28* day of *November* 192*1* ,
the unanimous judgment of the Court, then consisting of Judges
St. Paul, Claiborne, and Dinkelspiel, resulted in reversal of
the judgment of the trial Court.

        2nd. That on the *10* day of *December* 192*1* ,
motion for re-hearing was filed by the plaintiff, appellee herein,
and re-hearing granted on the *7* day of *January* 192*2*.

        3rd. That Hon. John St. Paul, having been
elected and having, on the *2* day of *January* 1922, qualified as
an Associate Justice of the Supreme Court of Louisiana, a va-
cancy in this Court was thus created.

        4th. That on the 16th day of January, 1922,
the aforesaid vacancy in this Court was filled by virtue of the
qualification of Wm. A. Bell, appointed by the Governor of
Louisiana to succeed Judge St. Paul.

        5th. That from January 16, 1922, to *~~March 18,~~ February 27th*
1922, Hon. Chas. F. Claiborne, the presiding judge of this
Court, was absent and unable to serve because of temporary illness.

6th. That during Judge Claiborne's illness, this case, being duly docketed, was ordered before Judges Dinkelspiel and Bell, and duly submitted, when, after consultation and due consideration of the case on re-hearing, Judge Dinkelspiel adhered to the former judgment of this Court, while Judge Bell was of the opinion that same was contrary to the law and to the evidence as disclosed by the record, and that the original judgment of the Court a qua, should be affirmed.

Considering the foregoing facts, and the law applicable thereto, I am of the opinion that Judge Claiborne, for reasons above set forth, was not qualified to participate in the judgment herein rendered on the 27th of February, 1922, and that in lieu of said judgment, the Court should have rendered, *ex proprio motu*, an order directing another re-hearing of the case so that at least two, if not all of the three Judges of this Court, after consideration of the case on second re-hearing, could have rendered a judgment as required by Art. VII., Sec. 26 -. Constitution 1921.

> The judgment of a Court on re-hearing, which either reinstates or else reverses or qualifies its former judgment, can in no manner be considered as an interlocutory ruling or order, but is a judgment of equal import as the original judgment, and in effect fully and finally determines the litigated issues involved.

For these reasons, believing that there has been no legal judgment, as yet, rendered by this Court, which has, or could have in effect, reinstated the judgment herein rendered on the 2 8 day of November 192 1 , I am therefore of the opinion that a second re-hearing should be granted.